# UNITED STATES DISTRICT COURT
for the
Southern District of California

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Black LG phone
IMEI 352411430113335
(Target Device)

Case No. '21 MJ1488

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the __Southern__ District of __California__, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC Sec. 841(a)(1) | Possession and Distribution of Controlled Substances |
| 21 USC Sec. 846 | Conspiracy |

The application is based on these facts:
See Attached Affidavit, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____ )* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Kyle Holley, DEA Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by __telephone__ *(specify reliable electronic means)*.

Date: April 21, 2021

*Judge's signature*

City and state: San Diego, California         Hon. Andrew G. Schopler, United States Magistrate Judge
*Printed name and title*

# **ATTACHMENT A**

## PROPERTY TO BE SEARCHED

The following property is to be searched:

    Black LG phone
    IMEI 352411430113335
    (Target Device)

The Target Device is currently in the possession of the Drug Enforcement Administration (DEA) located at 5810 Newton Drive, Carlsbad, California, 92008

## ATTACHMENT B
### ITEMS TO BE SEIZED

Authorization to search the cellular telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephones for evidence described below. The seizure and search of the cellular telephones shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the Target Device will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, web history, files, metadata, photographs, audio files, videos, and location data, for the period of March 20, 2021, up to and including April 20, 2021:

    a.    tending to indicate efforts to possess with the intent to distribute controlled substances within the United States;

    b.    tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the distribution of and/or the possession with the intent to distribute controlled substances within the United States;

    c.    tending to identify co-conspirators, criminal associates, or others involved in the distribution of and/or the possession with intent to distribute of methamphetamine or other controlled substances within the United States;

    d.    tending to identify travel to or presence at locations involved in the distribution of or possession with intent to distribute controlled substances within the United States, such as stash houses, residences used to prepare or process controlled substances, load houses, or delivery points;

    e.    tending to identify the user of, or persons with control over or access to, the Target Device; and/or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

which are evidence of violations of 21, U.S.C., §§ 841.

# AFFIDAVIT

I, Special Agent Kyle Holley, having been duly sworn, declare and state as follows:

## INTRODUCTION

1. I make this affidavit in support of an application for a warrant to search the following electronic device:

Black LG phone
IMEI 352411430113335
(Target Device)

as further described in Attachment A, and to seize evidence of crimes, specifically violations of Title 21, United States Code, Section 841(a)(1), Possession and Distribution of Controlled Substances, as further described in Attachment B. The requested warrant relates to the investigation and prosecution of Pedro Antonio LECHUGA (LECHUGA) for possession, with intent to distribute, approximately 30 kilograms (66.13 pounds) of methamphetamine. The Target Device is currently stored as evidence at the Drug Enforcement Administration (DEA) located at 5810 Newton Drive, Carlsbad, California, 92008.

2. The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement. Because this affidavit is made for the limited purpose of obtaining a search warrant for the Target Devices, it does not contain all the information known by me or other agents regarding this investigation. All dates and times described are approximate.

## BACKGROUND

3. I have been employed as a Special Agent with DEA since 2003. I am currently assigned to the San Diego Field Division (SDFD), Tactical Diversion Squad. I am a graduate of the DEA Academy in Quantico, Virginia.

4. During my tenure with DEA, I have participated in the investigation of various narcotics trafficking organizations involved in the importation and distribution of

controlled substances into and through the Southern District of California. Through my training, experience, and conversations with other law enforcement officers experienced in narcotics trafficking investigations, I have gained a working knowledge of the operational habits of narcotics traffickers, in particular those who attempt to import narcotics into the United States from Mexico at Ports of Entry and those who possesses and distribute narcotics within and throughout the United States.

5. I am aware that it is common practice for narcotics traffickers to work in concert utilizing cellular telephones and other portable electronic devices (such as Laptops, iPads, Tablets, etc.). A common tactic utilized by narcotics traffickers is to smuggle controlled substances into the United States from Mexico by concealing the controlled substances in vehicles or on persons entering the United States at Ports of Entry such as the San Ysidro Port of Entry and the Otay Mesa Port of Entry. With respect to the importation of narcotics in this manner, I am aware that narcotics traffickers in Mexico frequently communicate with the individual(s) responsible for importing and/or transporting the concealed narcotics in the United States. These communications can occur before, during and after the narcotics are imported into the United States and transported therein. For example, prior to the importation, narcotics traffickers frequently communicate with the transporter(s) regarding arrangements and preparation for the narcotics importation. When the importation is underway, narcotics traffickers frequently communicate with the transporter(s) to remotely monitor the progress of the narcotics, provide instructions and warn accomplices about law enforcement activity. When the narcotics have been imported into the United States, narcotics traffickers may communicate with co-conspirators immediately prior to and following their illicit transactions to negotiate prices and quantities, coordinate meeting times and locations, discuss the transportation through checkpoints, and then to discuss future transactions or future payments if the narcotics were "fronted" (delivered without being paid for in advance).

6. Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I am aware that cellular telephones (including their SIM card(s)) and other portable electronic devices (such as Laptops, iPads, Tablets, etc.) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones and other portable electronic devices (such as Laptops, iPads, Tablets, etc.) of individuals involved in the importation of narcotics may yield evidence:

  a. tending to indicate efforts to possess with the intent to distribute controlled substances within the United States;

  b. tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the distribution of and/or the possession with the intent to distribute controlled substances within the United States;

  c. tending to identify co-conspirators, criminal associates, or others involved in the distribution of and/or the possession with intent to distribute of controlled substances within the United States;

  d. tending to identify travel to or presence at locations involved in the distribution of or possession with intent to distribute controlled substances within the United States, such as stash houses, residences used to prepare or process controlled substances, load houses, or delivery points;

  e. tending to identify the user of, or persons with control over or access to, the Target Devices; and/or

   f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

7. On April 20, 2021, a United States Border Patrol Agent (BPA) was conducting anti-smuggling operations along the Interstate 5 (I-5) corridor as part of the San Clemente Border Patrol Station highway abatement unit. The I-5 corridor is well known by law enforcement as a route to smuggle illicit contraband into the United States. Due to this, BPAs as well as other law enforcement officers conduct regular patrols along this corridor attempting to intercept narcotics, illegal aliens, as well as enforcing bulk cash smuggling laws as part of their daily duties.

8. On the aforementioned date, at approximately 1:55 p.m. the BPA was conducting interdiction operations in a fully marked and equipped United States Border Patrol vehicle, positioned on the shoulder of the Las Pulgas Road exit on the northbound side of I-5 freeway. It was at this time that the BPA observed a gray Ford SUV bearing Mexican license plates pass this location. The BPA also noticed the Ford SUV significantly slow in speed and join a group of vehicles travelling at a slower speed. At one point, the Ford SUV slowed so much that the semi-trucks traveling in the number three and four lanes began to pass the Ford SUV traveling in the number two lane. It was also noticed by the BPA that the rest of the motoring public on the freeway at that time made no obvious reaction to the presence of the BPA, and the driver of the Ford, later identified as Pedro Antonio LECHUGA, was the only driver to do so.

9. As the BPA began to follow LECHUGA, at one point a semi-truck was in between the two vehicles on the freeway. The BPA then moved past the semi-truck in order to maintain a visual on LECHUGA and observed LECHUGA flip up his sunglasses and begin nervously looking around him and looking in his mirrors. This is behavior that the BPA has encountered on numerous other occasions when a smuggling event was

taking place. The BPA maneuvered to the other side of the Ford and noticed the posture of LECHUGA had changed from more relaxed to very stiff with an aggressive grip on the steering wheel. At this time LECHUGA made several quick glances at the BPA and had a very concerned look on his face.

10. After observing the nervous behavior and driving changes, the agent entered the license plate into DHS systems for record checks. The checks indicated that the vehicle had crossed the international border with Mexico earlier in the day around 10:45, driven by Yofiel SANCHEZ-Bibriesca, who had an intelligence alert linked to other vehicles associated with alien smuggling. The BPA compared a photographic image of SANCHEZ to LECHUGA and determined that LECHUGA was not the individual who crossed the FORD SUV into the United States. The practice of smugglers changing drivers once a smuggling vehicle has entered the United States is known as a "driver swap." Based on all the above circumstances, the BPA believed that a smuggling event was occurring.

11. The BPA conducted a vehicle stop. The BPA asked LECHUGA for identification along with the registration for the vehicle. LECHUGA stated the FORD SUV was not LECHUGA's vehicle. LECHUGA began to frantically look for the requested items and was nervously mumbling while doing so. When LECHUGA handed the BPA the documents, the BPA noticed LECHUGA's hands were extremely shaky. The agent asked LECHUGA to step out of the vehicle due to how nervous and agitated LECHUGA seemed to be. When out of the vehicle, LECHUGA began to look around as if he were contemplating running across the freeway to evade the agents. The BPA then detained LECHUGA for safety reasons.

12. LECHUGA was asked if he had anything illegal in the vehicle, to which he stated "no," and granted the BPA consent to have a canine sniff the vehicle. The canine gave a positive alert to the rear of the vehicle, where subsequently a large plastic container was found to contain 59 bundles packaged in a manner consistent with

narcotics smuggling. Subsequently the packages were determined to contain a substance which tested presumptively for methamphetamine with a seized weight of approximately 30 kilograms (66.13 pounds). This is a distribution quantity of methamphetamine.

13. LECHUGA was transported to the San Clemente Border Patrol station where he provided a post-Miranda statement. LECHUGA stated he was being paid $2,500 by a Hispanic female in Mexico known only as LA TAMALERA, to transport an unknown substance to Santa Ana, California.

14. LECHUGA was placed under arrest and charged with violation of Title 21 USC 841 (a) (1), Possession with the Intent to distribute a controlled substance.

15. The Target Device was found in LECHUGA's possession at the time of his arrest. He admitted ownership of the Target Device and provided consent for investigating agents to conduct a search of the Target Device.

16. Based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the Target Device. In light of the above facts and my experience and training, there is probable cause to believe that Defendant was using the Target Device to communicate with others to further the distribution of illicit narcotics within the United States. Further, in my training and experience, narcotics traffickers may be involved in the planning and coordination of a drug trafficking event in the days and weeks prior to an event. Co-conspirators are also often unaware of a defendant's arrest and will continue to attempt to communicate with a defendant after their arrest to determine the whereabouts of the narcotics. Based on my training and experience, it is also not unusual for individuals, such as Defendant, to attempt to minimize the amount of time they were involved in their trafficking activities, and for the individuals to be involved for weeks and

months longer than they claim. Accordingly, I request permission to search the Target Device for data beginning on March 20, 2021, up to and including April 20, 2021.

## METHODOLOGY

17. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode," which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

18. Following the issuance of this warrant, I will collect the Target Device and subject it to analysis. All forensic analysis of the data contained within the Target Device and memory card(s) will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

19. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

**PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE**

20. At the time of arrest, LECHUGA provided agents with consent to search the Target Device. The phone was accessed and a cursory review was conducted including recent calls. No additional searching of the phone was conducted. The search warrant is being requested to conduct a full download of the Target Device because it may contain additional evidence of drug trafficking.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

8

## CONCLUSION

21. Based on all of the facts and information described above, my training and experience, and consultations with other law enforcement officers, I submit there is probable cause to believe that a search of the Target Device will yield evidence of Defendant's violations of Title 21, United States Code, Section 841, Possession and Distribution of Controlled Substances. Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the items described in Attachment A, and seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Special Agent Kyle Holley
Drug Enforcement Administration

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 21st day of April, 2021.

_____
HON. ANDREW G. SCHOPLER
UNITED STATES MAGISTRATE JUDGE

9